# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

Marcus Sharif McNeal,

      Petitioner

v.

Ronald Oliver, et al.,

      Respondents

Case No.: 2:16-cv-01618-JAD-EJY

**Order Denying Petition for Writ of Habeas Corpus and Granting a Certificate of Appealability**

[ECF No. 66]

Petitioner Marcus Sharif McNeal was sentenced in Nevada state district court to an aggregate of 120 to 360 months imprisonment after a jury found him guilty of attempted murder with use of a deadly weapon.[1]  McNeal seeks a writ of habeas corpus under 28 U.S.C. § 2254.[2]  I previously dismissed one of McNeal's grounds (ground III) because it was unexhausted.[3]  Now addressing McNeal's remaining grounds on their merits, I deny grounds I(A), I(C), I(D), II, VI, and VII, and dismiss grounds I(B), I(E), IV, and V.  But because reasonable jurists may disagree with my ruling on grounds I(A), I(C), II, IV(B), and VII, I grant a certificate of appealability for those grounds.

## Background

**A.  Facts underlying McNeal's convictions**

In March 2013, Edward Duncan lived near 21st St. and Sunrise Ave. in Las Vegas, Nevada.  One day, he noticed four Hispanic men near his apartment conducting what he believed were "drug transactions."  He got a good look at an African American man with the group,

---

[1] ECF No. 23-3.

[2] ECF No. 66.

[3] ECF No 83.

whom he later identified as Marcus McNeal, but did not see McNeal sell any drugs.  Duncan saw McNeal in the area on other occasions.  Duncan told the men "not to hang out in front" of his house, remarking that he "didn't care what they did for a living, they just couldn't do it there."[4]

A week later, Duncan encountered the same men at the same location at around 9:35 p.m.  This time he told them "that if they didn't leave, [he] would call the police."  As Duncan walked away, he heard McNeal reply, "Fuck you, punk, bitch."  When Duncan turned around, he saw McNeal jump to his feet, lift his t-shirt, pull out a revolver and fire it, hitting Duncan's groin.  Someone then pulled Duncan's hoodie over his head, held him back, and hit him on the top of head with the revolver approximately five times.  Duncan managed to break free from the attacker and, as he ran away, McNeal shot him several more times.  He then ran to his neighbor Delores Cardona's door who, along with other neighbors, heard the shots and called 9-1-1.[5]

Las Vegas Metropolitan Police Department (Metro) officers Matthew Eschker and Jesse Kibble responded to the calls.  They found Duncan outside Cardona's door bleeding, writhing in pain, and begging for his life.  According to Eschker, Duncan initially described the suspects as one Hispanic male and one African American male.  Two minutes later, Duncan described the shooter as an African American male with "curls" in his hair wearing a "black t-shirt and black baseball cap."  That description was broadcast to other officers.[6]  Neighbor Rose Hemsley overheard Duncan tell the police "he knew the guy and that he was a[n African American] guy,"

---

[4] ECF No. 119-12 at 35–49.

[5] ECF No. 22-26 at 24–25; ECF No. 22-27 at 56, 76–78, 85–87; ECF No. 22-28 at 5–6; ECF No. 119-12 at 38–84; ECF No. 119-13 at 63–64.

[6] ECF No. 22-26 at 11–17; ECF No. 119-13 at 98–109.

and never heard Duncan identify the shooter as a Hispanic male.  Cardona claimed that she heard Duncan tell the police that "a Mexican down the street" shot him.[7]

Duncan was treated at University Medical Center where he underwent emergency surgery for four life-threatening gunshot wounds at the base of his penis, below his belly button, in his right buttock, and in his right lower back.  Police were unable to conduct a follow-up interview with Duncan until five days later because Duncan was either unconscious or intubated.[8]

Metro Detective Marc Colon investigated the shooting and learned about an anonymous note left at the scene.  The note relayed some information about the potential shooter:

> Word on the block is that a black guy who goes by "Rock" was out to get two Hispanics for ripping him off of money/dope.  He was after a Hispanic male, short/thin build, 30 years or older, named "Luis" and a younger Hispanic female, medium height/thin build, long dark hair, late teens-mid-twenties, goes by "Whetta!" "Rock" is a black male, 22-30 yrs old?  (Guestimate) medium height & build, darker skinned with short (not bald) dark curly hair.  (turn over)
> Leave a contact card for me in the empty, broken mailbox that does not have a lock.  The mailboxes are on the sidewalk in front of where your crime tape is.  Circle or write your name and phone # on the card & I will call you later to make contact.  It isn't safe to be seen talking to cops here.[9]

Colon then learned that McNeal goes by the nickname "Rock" and matched Duncan's description of the shooter.  Colon included McNeal's photograph in a six-pack photographic lineup.  When Duncan was capable of an interview, he told Colon that he did not know the

---

[7] ECF No. 22-26 at 21–35; ECF No. 22-27 at 79.

[8] ECF No. 22-27 at 31, 39–40, 49; ECF No. 119-13 at 84–87, 92–93.

[9] ECF No. 23-21 at 4.

shooter's name but had previously seen him in the neighborhood.  Duncan identified McNeal in the lineup as the shooter with 100% certainty.[10]

McNeal testified at his preliminary hearing (against the advice of counsel) and a redacted version of his testimony was read to the jury and transcribed into the trial transcript.  McNeal testified that Duncan "had words with the Latino guys" after Duncan tried to buy methamphetamine from them but was told that they didn't sell it.  Duncan told the men that he was "a member of the Hells Angels," stated that it was "their street," and threatened to kill one of the men.  McNeal said that he tried to get between the men and tell them to back off from each other, but "[t]he next thing you know I turn around and I see shots and this guy falls to the ground, gets up, and takes off running."  McNeal ran as soon as he heard shots and didn't know who shot Duncan.  He admitted that his nickname is "Rock."[11]

**B.      Jury selection and McNeal's untimely *Batson* challenge**

At McNeal's trial, peremptory challenges were made by "secret ballot."  The state exercised four of its five challenges while the defense exercised all five of its allotted challenges.  The members of the jury were announced immediately after each side exercised or waived their challenges and the balance of the venire was dismissed.  The trial court read its preliminary instructions to the jury and dismissed the jury for a break.  Defense counsel then challenged the prosecution's strikes under *Batson v. Kentucky*,[12] contending that "two of the first three" peremptory challenges exercised by the state "involved the only two African Americans on the

---

[10] ECF No. 22-27 at 10–21, 32–59.

[11] ECF No. 22-26 at 71–79.

[12] *Batson v. Kentucky*, 476 U.S. 79 (1986).

jury."  The defense requested an explanation from the state for the strikes of prospective jurors 102 and 118, whom "appeared [to counsel] to be African American."[13]

The trial court asked why the challenge was not made when the state exercised their challenges.  Trial counsel replied that "perhaps [he] should have" raised the issue earlier, but he didn't want to interrupt the proceeding.  The trial court noted, "[i]f I accept your challenge on one of these, I can't bring the other jurors back in for us to put them in the panel."  Defense counsel stated that he had no response to that conundrum.  The court ruled the request tardy but asked for the state's explanation.

The prosecutor asserted that he excused prospective juror 102 because he was worried about her "competency in terms of intelligence," as "she didn't come across as understanding the questions" that he asked her, prompting concerns over "whether or not she would be able to deliberate effectively."  Defense counsel "didn't notice any competency issues" that made her an ineffective juror, claiming that she answered questions "just fine."  As for prospective juror 118, the prosecutor stated that he was unsure whether or not the juror was African American, explaining that he excused juror 118 because he was "in academia at university," and academics "tend to be more liberal."  Defense counsel argued that juror 118 was "rather obviously" African American," was "qualified" to serve as a juror, and had stated that he would be fair to both sides.

The trial judge noted that prospective juror 102 was an "elderly lady in the back row," and he "had a little concern about her ability to understand the proceedings."  The judge also explained that the untimeliness of the challenge prevented him from confirming whether juror 118 was African American or not.  Nevertheless, the judge denied the *Batson* challenge, ruling: "I do find the *Batson* challenge to be untimely; however, based upon the responses from the

---

[13] ECF No. 22-24 at 3; ECF No. 67-1 at 234–36; ECF No. 119-12 at 17.

1 state, they appear to the court to be neutral based.  I don't see a systematic exclusion of African

2 Americans . . . in this particular case, so the *Batson* challenge is denied."[14]

3 **C.    Objections to and testimony about the anonymous note**

4       The prosecutor argued in opening statements that someone left an anonymous note at the

5 scene that stated, "Rock," aka McNeal, "was responsible for the shooting—or that they heard

6 that Rock was looking to shoot someone."  The prosecutor acknowledged that the note's

7 description of McNeal's age was inaccurate but explained that the detective investigating the

8 case was able to match the general description to McNeal, who was "known to frequent th[e]

9 area."  Defense counsel in opening remarks argued that the jury would "see the note," the note's

10 description of "Rock" did not match McNeal, Duncan was the sole witness identifying the

11 shooter, and the jury would question Duncan's credibility.[15]

12       Detective Colon testified that he had little information about the shooter's identity

13 besides Duncan's description of the shooter until a patrol officer found an anonymous note left

14 near the scene.  Before Colon could testify further, defense counsel objected that the note

15 contained hearsay and lacked foundation.  The state argued that it intended to ask about the

16 contents of the note for the purpose of describing Colon's next investigative steps; not for the

17 truth of the matter asserted.  The trial court ruled that the state could ask "him if he read the note,

18 and as a result of reading the note what did he do." Without discussing the contents of the note,

19 the state elicited Colon's testimony that the note led him to develop "a suspect."  When the state

20 asked Colon "how" he developed a suspect, defense counsel sought a bench conference.[16]

21

22 ―――――――――――
[14] ECF No. 119-12 at 17–21 (cleaned up).

23 [15] *Id.* at 26–27, 33–34.

[16] ECF No. 22-27 at 32–33.

At the bench, the state divulged that Colon would testify that the note contained the name "Rock." The defense argued that such testimony was prejudicial as McNeal testified at the preliminary hearing that he uses the name Rock. The state responded that it had no other way to establish why Metro included McNeal in the lineup and sought to elicit testimony establishing that "the description in the note matches someone that goes by the name of Rock, and that based on that they figured out who Rock could be, and they put him in [a] six-pack line up." He also noted that defense counsel was prepared to stipulate to introduction of the note before trial, and defense counsel responded that he had "changed [his] mind." The defense said that "the jury's going to think [that] the note says Rock is the shooter in this case," exclaiming, "they're going to think that [an] anonymous tipster left [a note stating], 'I was a witness, it was Rock, he shot [Duncan], and that's what developed the suspect.'"[17]

The trial court denied defense counsel's request to elicit testimony that "this note in no way, shape, or form implied that Rock (or McNeal) was the shooter," ruling that the note was hearsay. The trial court told the prosecutor that he could ask, without reference to the note, whether Colon "investigated and reviewed materials" and what the detective did based on that investigation and review. Ultimately, Colon testified that he "[r]eviewed some material from the crime scene in order to develop a suspect . . . that goes by" the moniker "Rock," and that McNeal used that moniker. The trial court overruled defense counsel's objections to that testimony. On cross-examination, Colon said that he suspected McNeal as the shooter based on Duncan's identification after he developed "Rock" as a suspect from "another source."[18] Defense counsel

---

[17] *Id.* at 33–38.

[18] *Id.* at 32–41, 57–58.

1  didn't request a limiting instruction that the note should not be considered for the truth of the

2  information it contained, and the trial court didn't give one sua sponte.

3         In closing remarks, the prosecutor argued, "You also heard through a retelling of the

4  Defendant's preliminary hearing that [McNeal] goes by the name Rock" and that the

5  "investigation established an individual that goes by the name Rock as the assailant."  Defense

6  counsel responded in closing that McNeal admitted his nickname was "Rock," but other than

7  Duncan's identification, the state presented no other evidence to show that McNeal was the

8  shooter.  In rebuttal, the state argued that there were sources (presumably the anonymous note)

9  showing that "Rock matches the description given by the victim, Edward Duncan . . . ."[19]

10        During deliberations, the jury sent a note asking how the detectives were led to the name

11 "Rock" as the shooter, and the trial court told the jury to rely on the evidence presented:

> Regarding the anonymous note to the police naming the "Rock" as the shooter
>
> 1. Is it entered as evidence?—No.
>
> 2. The detective referred to it, can we consider it?—The jury is free to consider any and all testimony presented at trial.
>
> 3. Can we get a copy of the State's opening power point presentation?—No, it was not entered into evidence.
>
> 4. Can you clarify <u>how</u> the detectives[] were led to the name "Rock" as the shooter?—No, the Court is not at liberty to supplement the evidence.[20]

19 **D.     Objections to and remarks about McNeal's potential drug dealing**

20        Before trial, the state moved to introduce Duncan's testimony that McNeal was with a

21 group of individuals who were selling narcotics at the time of the offense.  It argued that the jury

22

---

23 [19] ECF No. 22-28 at 37, 43–44, 59, 71–72.

[20] ECF No. 119-2 at 38–39 (cleaned up).

needed to hear that testimony to get the "complete story of the crime" and explain why McNeal and Duncan had an argument before the shooting.  The defense responded that Duncan merely assumed that the group was selling drugs, but there was no evidence to prove that they were.  At a pre-trial hearing, the judge indicated that he was inclined to let those facts be introduced at trial.[21]

During opening statements, the state argued that the evidence would show that Duncan witnessed "a small group of predominantly Hispanic males" "doing narcotic transactions" and, a week before the shooting, Duncan had a conflict "with a group of individuals . . . all Hispanic, except for . . . McNeal."  The state argued that Duncan told them, "I don't care how you make your living, but just move away from my apartment.  Move away from where I'm living.  Move away from the families here."  The state argued that, on the night he was shot, Duncan saw the same "group of Hispanic males and Mr. McNeal" and told them, "[m]ove on.  Don't be doing this stuff—don't be selling this stuff in front of my house; move on."[22]

Defense counsel later objected to Duncan's testimony that he told four Hispanic men and McNeal to take their "business" elsewhere because it suggested McNeal was dealing drugs.  The trial court agreed that the state could not leave an impression that McNeal was selling drugs but overruled the objection because Duncan clarified that he did not see McNeal conduct drug transactions.  Counsel moved for a mistrial, arguing that Duncan's testimony about "business" suggested McNeal was involved in drug sales.  The trial court denied the motion because the state did not "elicit[] any comment with the intent to infer that [McNeal was selling drugs]" and, after the bench conference, the prosecution asked clarifying questions to elicit testimony that

---

[21] ECF No. 22-19 at 5–6; ECF No. 117-2 at 5–9.

[22] ECF No. 119-12 at 22–23.

1    Duncan did not see McNeal selling drugs.  The court told defense counsel that he was "[f]ree on

2    cross-examination . . . to reiterate" that Duncan did not see McNeal conduct "hand-to-hand drug

3    sales."[23]

4           In closing remarks, the prosecutor argued that Duncan encountered four Hispanic men

5    and McNeal and "recognized them as being associated with some sort of negative dealings"

6    around his home.  In defense counsel's closing remarks, counsel painted Duncan as a drug user

7    in order to cast doubt on the credibility of his testimony that he confronted McNeal and the four

8    Hispanic men in order to keep them from selling drugs near his home.  During the course of that

9    character-assassination attempt, counsel repeatedly referenced Duncan's testimony that he

10   believed the four Hispanic men were engaged in drug dealing.[24]

11                                          **Discussion**

12          McNeal filed his original federal petition pro se, alleging 24 grounds of constitutional

13   error.[25]  The state moved to dismiss the petition because many of his grounds were

14   unexhausted.[26]  I granted that motion in part and ordered McNeal to advise the court how he

15   wanted to proceed with his mixed petition.[27]  I later granted McNeal's motion for the

16   appointment of counsel,[28] and his attorney filed an amended petition containing seven claims:[29]

17

18   _____

     [23] *Id.* at 43–47, 80–85.

19   [24] ECF No. 22-28 at 33–34, 49–53.

20   [25] ECF No. 6.

     [26] ECF No. 21.

21   [27] ECF No. 38.  I do not summarize the procedural history involving McNeal's other petitions

22   that were transferred and consolidated into this case following a Ninth Circuit appeal, as it is
     irrelevant to the resolution of the pending petition.  *See* ECF No. 60 at 2–3.

23   [28] ECF No. 60; ECF No. 62.

     [29] ECF No. 62 (order appointing counsel); ECF No. 66 (fifth-amended petition).

- Ground I: trial counsel provided ineffective assistance by failing to:

  - I(A): timely invoke a racial-bias challenge under *Batson v. Kentucky*[30];

  - I(B) move to suppress Duncan's identification of McNeal;

  - I(C) move to exclude the anonymous note or object to references to its contents;

  - I(D) object to the prosecutor's closing statements suggesting that McNeal was a drug dealer and to remarks about the anonymous note; and

  - I(E) investigate witnesses;

- Ground II: the trial court violated the confrontation clause of the United States Constitution by permitting the prosecution to introduce evidence about the anonymous note;

- Ground III: the trial court denied McNeal a fair trial when it allowed prior-bad-acts evidence to be used against him;

- Ground IV: the prosecutor committed misconduct in statements to the jury by:

  - IV(A): suggesting that McNeal was a drug dealer; and

  - IV(B): mischaracterizing the anonymous note as identifying McNeal as the shooter;

- Ground V: McNeal was denied his right to counsel due to a conflict of interest;

- Ground VI: the state suppressed material impeachment evidence; and

- Ground VII: cumulative error.[31]

---

[30] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[31] ECF No. 66.

11

The state again moved to dismiss, arguing that several of those claims were also unexhausted or procedurally barred.[32]  I dismissed ground III as unexhausted.[33]  I also found that grounds I(B), I(E), and V were technically unexhausted and thus procedurally barred but deferred consideration of those grounds so that the parties could present argument on whether McNeal could show cause and prejudice to overcome that default.[34]  And McNeal concedes in his reply that ground VI—alleging that the state suppressed material impeachment evidence—should be dismissed,[35] so I dismiss that claim.  I now address the merits of McNeal's remaining grounds I, II, IV, V, and VII.

**A.    Legal standard**

If a state court has adjudicated a habeas corpus claim on its merits, a federal district court may only grant habeas relief if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."[36]  A state court acts contrary to clearly established federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts.[37]  And a state court unreasonably applies clearly established federal law if it engages in an objectively unreasonable application of the correct governing legal rule to the

---

[32] ECF No. 75.

[33] ECF No. 83.

[34] *Id.*

[35] *See* ECF No. 116 at 49–51.

[36] 28 U.S.C. § 2254(d) (cleaned up).

[37] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

facts at hand.[38]  The Antiterrorism and Effective Death Penalty Act (AEDPA) does not, however, "require state courts to *extend*" Supreme Court precedent "to a new context where it should apply" or "license federal courts to treat the failure to do so as error."[39]  The "objectively unreasonable" standard is difficult to satisfy;[40] "even 'clear error' will not suffice."[41]  "The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."[42]

Habeas relief may only be granted if "there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."[43]  As "a condition for obtaining habeas relief," a petitioner must show the state-court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."[44]  "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief under Section 2254(d) is precluded.[45]  AEDPA "thus imposes a 'highly deferential standard for evaluating state-court rulings' . . . and 'demands that state-court decisions be given the benefit of the doubt.'"[46]  If a federal district court finds that a state court committed error under § 2254, the

---

[38] *White v. Woodall*, 572 U.S. 415, 424–27 (2014).

[39] *Id.*

[40] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

[41] *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (citation omitted).

[42] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[43] *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

[44] *Id.* at 103.

[45] *Id.* at 101.

[46] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

district court must review the claim de novo.[47]  The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief.[48]  A state court's factual findings are presumed correct unless rebutted by clear and convincing evidence.[49]

**B.    Ground I: ineffective assistance of trial counsel**

The right to counsel embodied in the Sixth Amendment guarantees "the right to the effective assistance of counsel."[50]  In the hallmark case of *Strickland v. Washington*, the United States Supreme Court held that an IAC claim requires a petitioner to show that (1) his counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all of the circumstances of the particular case;[51] and (2) it is reasonably probable that, but for counsel's errors, the result of the proceedings would have been different.[52] A reasonable probability is a "probability sufficient to undermine confidence in the outcome."[53] The likelihood of a different result must be substantial, not just conceivable.[54]

Any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct so as to avoid the distorting effects of hindsight.[55]  Counsel can "deprive a defendant of the right to effective assistance[] simply by

---

[47] *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

[48] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[49] 28 U.S.C. § 2254(e)(1).

[50] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

[51] *Id.* at 690.

[52] *Id.* at 694.

[53] *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000) (quoting *Strickland*, 466 U.S. at 694).

[54] *Pinholster*, 563 U.S. at 189 (citing *Richter*, 562 U.S. at 112).

[55] *Strickland*, 466 U.S. at 689.

failing to render 'adequate legal assistance[.]'"[56]  A petitioner making an IAC claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."[57]  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practice or most common custom.[58]  A petitioner must overcome the presumption that counsel made sound trial-strategy decisions.[59]  It is inappropriate to focus on what could have been done rather than focusing on the reasonableness of counsel's performance.[60]

The United States Supreme Court describes federal review of a state supreme court's decision on an IAC claim as "doubly deferential."[61]  So federal district courts "take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d)'"[62] and consider only the record that was before the state court that adjudicated the claim on its merits.[63]

### 1.   Ground I(A): counsel's untimely *Batson* challenge

In ground I(A), McNeal alleges that trial counsel's untimely *Batson* challenge to the state's peremptory strikes of prospective jurors 102 and 118 constitutes ineffective assistance of counsel.  Respondents argue that McNeal was not prejudiced because the trial court denied the

---

[56] *Id.* at 686 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 344–50 (1980)).

[57] *Id.* at 690.

[58] *Richter*, 562 U.S. at 105.

[59] *Id.* at 104–05.

[60] *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Strickland*, 466 U.S. at 687–94).

[61] *Pinholster*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

[62] *Id.*

[63] *Id.* at 181–85.

1  *Batson* challenge on a substantive basis, and a timely challenge would not have achieved a

2  different result.[64]

3           ***a.        Standard for Batson claims***

4           *Batson v. Kentucky*,[65] the landmark United States Supreme Court case addressing racial

5  biases in jury selection, "held that the Equal Protection Clause of the Fourteenth Amendment

6  prohibits prosecutors from exercising peremptory challenges on the basis of race."[66]  To prove a

7  *Batson* violation, the defendant must demonstrate that "race was a substantial motivating factor"

8  in the prosecutor's use of the peremptory strike.[67]  "A defendant of any race may raise a *Batson*

9  claim, and a defendant may raise a *Batson* claim even if the defendant and the excluded juror are

10 of different races."[68]  A petitioner need not show a pattern of discriminatory strikes in order to

11 obtain relief as it is forbidden to strike a single prospective juror for a discriminatory purpose.[69]

12          The following factors may be considered in determining whether a *Batson* violation

13 occurred: (1) "statistical evidence about the prosecutor's use of peremptory strikes against black

14 prospective jurors as compared to white prospective jurors in the case"; (2) "evidence of a

15 prosecutor's disparate questioning and investigation of black and white prospective jurors in the

16 case"; (3) "side-by-side comparisons" of black prospective jurors who were struck and white

17 prospective jurors who were not struck in the case; (4) a prosecutor's misrepresentations of the

18

---

19 [64] ECF No. 66 at 7–13; ECF No. 114 at 9–12; ECF No. 116 at 10–21.

20 [65] *Batson*, 476 U.S. 79 (1986).

   [66] *Davis v. Ayala*, 576 U.S. 257, 270 (2015) (citing *Batson*, 476 U.S. at 89).

21 [67] *Cook v. LaMarque*, 593 F.3d 810, 814–15 (9th Cir. 2010) (relying on *Snyder v. Louisiana*, 552
22 U.S. 472 (2008)).

   [68] *Flowers v. Mississippi*, 588 U.S. ——, 139 S. Ct. 2228, 2243 (2019) (citing *Hernandez v.*
23 *Texas*, 347 U.S. 475, 477–478 (1954) and *Powers v. Ohio*, 499 U.S. 400, 406 (1991)).

   [69] *Foster v. Chatman*, 578 U.S. 488, 499 (2016) (quoting *Snyder*, 552 U.S. at 478).

16

record when defending the strikes during the *Batson* hearing; (5) relevant history of the state's

peremptory strikes in past cases; and (6) other relevant circumstances that bear upon the issue of

racial discrimination.[70]

Trial courts follow a three-step process when considering a *Batson* claim:

> First, a defendant must make a prima facie showing that a
> peremptory challenge has been exercised on the basis of race;
> second, if that showing has been made, the prosecution must offer
> a race-neutral basis for striking the juror in question; and third, in
> light of the parties' submissions, the trial court must determine
> whether the defendant has shown purposeful discrimination.[71]

If the defendant satisfies the first prong, the prosecution must then "give a clear and reasonably

specific explanation of [the prosecutor's] legitimate reasons for exercising the challenge[ ]."[72]

The explanation for the second prong need not be "persuasive, or even plausible"; rather, the

"issue is the facial validity of the prosecutor's explanation."[73]  "Unless a discriminatory intent is

inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."[74]

*Batson*'s third step requires the trial court to evaluate, using "the totality of the relevant facts

about the prosecutor's conduct,"[75] "the persuasiveness of the prosecutor's explanation to

determine whether the defendant has ultimately satisfied the burden of proving racial

---

[70] *Flowers*, 139 S. Ct. at 2243 (citations omitted).

[71] *Snyder*, 552 U.S. at 476-77 (internal quotation marks and brackets omitted).

[72] *Batson*, 476 U.S. at 98 n.20 (internal quotation marks omitted).

[73] *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) (per curiam) (internal quotation marks omitted).

[74] *Id.*

[75] *Miller–El v. Dretke*, 545 U.S. 231, 239 (2005)).

17

discrimination in the prosecutor's exercise of peremptory challenges."[76]  "The defendant has the burden of proving purposeful discrimination by a preponderance of the evidence."[77]

The Supreme Court has recognized as "sensible" a state-court rule that a *Batson* claim is untimely if "raised for the first time on appeal, or after the jury is sworn, or before its members are selected."[78]  The Ninth Circuit has stated that "*Batson* objections must occur as soon as possible, preferably before the jury is sworn,"[79] but may not be untimely if "[t]he pattern of the prosecution's peremptory challenges might not have been apparent until the jury was selected," such that the objection could not have been raised earlier.[80]

### b.     The state appellate court's determination

The Nevada Court of Appeals determined that trial counsel's untimely *Batson* challenge was not prejudicial under *Strickland*:

> [M]cNeal argues his trial counsel was ineffective for raising an untimely *Batson* challenge.  McNeal fails to demonstrate prejudice for this claim.  After completion of jury selection, McNeal's trial counsel raised a *Batson* challenge because the State had used its peremptory challenges to strike two African-American jurors.  The trial court stated the challenge was untimely because the jurors had already left the courtroom and were not available for further proceedings.  However, the trial court also permitted McNeal to make a prima facie case of racial discrimination and then permitted the State to present race-neutral reasons for striking the jurors.  Following those presentations, the trial court ultimately denied the challenge on its merits.  As the trial court proceeded through the three-step analysis of a *Batson* challenge and concluded McNeal's challenge lacked merit, *Conner v. State,* 327 P.3d 503, 508 (2014), he fails to demonstrate a reasonable probability of a different

---

[76] *Murray v. Schriro*, 745 F.3d 984, 1003 n.2 (9th Cir. 2014) (relying on *Purkett*, 514 U.S. at 768).

[77] *Crittenden v. Ayers*, 624 F.3d 943, 958 (9th Cir. 2010).

[78] *Ford v. Georgia*, 498 U.S. 411, 422–23 (1991).

[79] *Dias v. Sky Chefs, Inc.*, 948 F.2d 532, 534 (9th Cir. 1991).

[80] *United States v. Thompson*, 827 F.2d 1254, 1257 (9th Cir. 1987).

1   outcome at trial had counsel raised the *Batson* challenge earlier in
2   the trial proceedings.  Therefore, the district court did not err in
    denying this claim without conducting an evidentiary hearing.[81]

3                   **c.    *The state appellate court reasonably applied <u>Strickland</u>.***

4          McNeal theorizes that the state appellate court unreasonably applied *Strickland*'s

5   prejudice prong by determining that the outcome "at trial" would not have been different had

6   counsel raised his objection earlier, when it should have considered whether the outcome of the

7   *Batson* challenge would have been different.[82]  But the state appellate court correctly stated the

8   *Strickland* prejudice standard, i.e., whether "the outcome of the proceedings would have been

9   different."[83]  I conduct deferential review[84] of the state appellate court's determination for

10  ground I(A) because the state appellate court's affirmance order can be reasonably construed as a

11  determination that the outcome of the *Batson* challenge would not have been different had it

12  been invoked earlier.

13         Applying that deferential-review standard, I conclude that the state appellate court was

14  not unreasonable in its application of the *Strickland* prejudice prong.  McNeal fails to show a

15  reasonable probability that the outcome of the proceeding would have been different had counsel

16

17  ─────────────
    [81] ECF No. 24-11 at 2–5 (footnotes omitted).

18  [82] ECF No. 116 at 19–21.

    [83] Ecf No. 24-11 at 2–5.

19
20  [84] McNeal implies in his reply that I should review de novo his IAC claim for failure to invoke a
    timely *Batson* challenge.  He relies on the Supreme Court of Nevada's opinion in *Brass v. State*,
    291 P.3d 145, 148 (Nev. 2012), to allege that trial counsel's failure to invoke *Batson* before the
21  prospective jurors were released constitutes structural error, theorizing that counsel's actions
    were "essentially the same as if" counsel failed to make a *Batson* objection at all.  ECF No. 116
22  at 18–19.  But this argument was raised for the first time in McNeal's counseled reply brief, so I
    decline to consider it.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (holding that
23  district courts "need not consider arguments raised for the first time in a reply brief"); *Cacoperdo
    v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) (holding that habeas petitioners cannot raise
    additional grounds in a reply brief).

1  made the challenge earlier.  McNeal presented no evidence suggesting that the trial court would

2  have conducted a different analysis or reached a different determination had counsel objected

3  when the balance of the venire been present.  And the state appellate court correctly noted that

4  the trial court resolved the *Batson* challenge on its merits, not on timeliness grounds.  So I find

5  that McNeal is not entitled to federal habeas relief for ground I(A).  I will, however, grant a

6  certificate of appealability for ground I(A) because reasonable jurists could find my conclusion

7  on the merits of this claim debatable or wrong.[85]

8  ### 2.   Ground I(B): counsel's failure to suppress Duncan's identification

9          McNeal claims that trial counsel's failure to move to suppress Duncan's identification of

10  him constitutes ineffective assistance.  I previously ruled that this ground was procedurally

11  defaulted, so McNeal must show cause and prejudice to overcome that default.  Respondents

12  argue that McNeal fails to carry that burden because any motion to suppress Duncan's

13  identification would have been meritless:[86] Duncan's identification was not unreliable, and the

14  six-pack lineup through which he identified McNeal was not unnecessarily suggestive.[87]

15  Because moving to suppress the identification would have been futile, the state reasons, [88]

16  McNeal cannot show cause to excuse default.

17

18

19

20

---

21  [85] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

22  [86] *See James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994) (noting that defense counsel's "failure to make a futile motion does not constitute ineffective assistance of counsel").

23  [87] ECF No. 66 at 13–15; ECF No. 114 at 12–13; ECF No. 116 at 21–25.

    [88] ECF No. 114 at 13 (citing *Borg*, 24 F.3d at 26).

###### a.   *Overcoming default for IAC claims*

In Nevada, petitioners must raise IAC claims in a first state petition for postconviction review, which is considered the initial-collateral-review proceeding.[89]  If a Nevada petitioner fails to raise an IAC claim in that initial proceeding, it is considered procedurally defaulted.[90]  But, as the United States Supreme Court held in *Martinez v. Ryan*, a petitioner can overcome that default in a federal habeas proceeding if he establishes cause to excuse the default and prejudice from a violation of federal law.[91]  A petitioner may establish cause to overcome a defaulted IAC claim by showing that (1) the claim is "substantial" and (2) the petitioner had "no counsel" or only "ineffective" counsel during the initial-collateral-review proceeding.

To show that a claim is "substantial," a petitioner must demonstrate that the underlying IAC claim against trial counsel has "some merit" and is not "wholly without factual support."[92]  The standard for issuing a certificate of appealability is an analogous standard for determining whether a claim is substantial.[93]  Under that standard, a petitioner must make a "substantial showing of the denial of a constitutional right" and show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"[94]  This standard does not require a showing that the claim will succeed, only that its

---

[89] *See Rodney v. Filson*, 916 F.3d 1254, 1260 (9th Cir. 2019) (citing *Corbin v. Nevada*, 892 P.2d 580, 582 (1995)).

[90] *Id.* at 1259.

[91] *Martinez v. Ryan*, 566 U.S. 1, 10 (2012).

[92] *Id.* at 14–16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).

[93] *Id.*

[94] *Miller-El*, 537 U.S. at 336.

proper disposition could be debated among reasonable jurists.[95]  Petitioners must make some showing that trial counsel's performance was deficient and that the deficient performance harmed the defense.[96]  On all such issues, if reached, the court's review is de novo.[97]

### b.   Standards for suppressing witness identification

"[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary."[98]  Even if law enforcement's identification procedure is suggestive and unnecessary, "suppression of the resulting identification is not the inevitable consequence."[99]  "The Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'"[100] "Convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."[101]

Factors to consider when evaluating the likelihood of misidentification include "the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of

---

[95] *Id.* at 336–38.

[96] *Strickland*, 466 U.S. at 687–88, 694.

[97] *Visciotti v. Martel*, 862 F.3d 749, 769 (9th Cir. 2016) ("We agree with our sister circuits that have reviewed [IAC] claims in the cause-and-prejudice context de novo, thereby applying a differing standard for evaluating constitutional error as a substantive basis of relief and as a cause to avoid default of other claims.") (internal quotation marks omitted).

[98] *Perry v. New Hampshire*, 565 U.S. 228, 238–39 (2012) (citing *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977), and *Neil v. Biggers*, 409 U.S. 188, 198 (1972)).

[99] *Id.* (citing *Brathwaite*, 432 U.S. at 112–13, and *Biggers*, 409 U.S. at 198–99).

[100] *Id.* (cleaned up).

[101] *Simmons v. United States*, 390 U.S. 377, 384 (1968) (cleaned up).

attention, the accuracy of [his] prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."[102]  "Reliability of the eyewitness identification is the linchpin of that evaluation."[103]  "Where the indicators of a witness'[s] ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion, the identification should be suppressed."[104]  "Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury" "to ultimately determine its worth."[105]

> ### c.   Any motion to suppress Duncan's identification would have been futile, so trial counsel's failure to make that motion does not show substantial ineffective assistance.

McNeal alleges that trial counsel was substantially ineffective for failing to move to exclude Duncan's identification of McNeal because the photographic lineup was unnecessarily suggestive and unreliable.  He claims that it was suggestive because McNeal's photograph was included based on the anonymous note, he was the only person whom Duncan would recognize, police showed it to Duncan after several visits, and police stopped investigating after Duncan identified McNeal as the shooter.

The record fails to establish that the lineup procedure was unnecessary or suggestive.  Detective Colon attempted to interview Duncan before showing Duncan the lineup and did not divulge McNeal's name or his nickname "Rock," nor did he mention the anonymous note.  Colon learned that McNeal matched Duncan's description of the shooter.  Colon chose

---

[102] *Biggers*, 409 U.S. at 199–200.

[103] *Perry*, 565 U.S. at 239 (cleaned up).

[104] *Id.* (cleaned up).

[105] *Id.* at 239, 232.

photographs of five individuals resembling McNeal[106] to accompany McNeal's photograph in the lineup "[t]o make it difficult for the victim to pick out just anybody—to make sure they're able to pick out the actual suspect."[107]   Colon instructed Duncan that he was not required to choose anyone in the lineup.[108]   Duncan identified McNeal as the shooter with 100% certainty only five days after the shooting and as soon as practical given Duncan's hospitalization.[109] McNeal contends that Duncan's familiarity with McNeal—when he also lacked that familiarity with any of the other people included in the lineup—made inclusion of McNeal's photograph in the lineup suggestive.   But that familiarity could go either way: had Duncan seen McNeal in other settings before, but the man he recognized in the lineup was *not* the man who shot him, Duncan would have been able to exclude McNeal more easily than others.   All reasonable jurists would agree that Duncan's awareness of what McNeal looked like prior to the shooting did not necessarily render the lineup suggestive, and nothing suggests it did so here.

The record also fails to show that the lineup procedure created a substantial likelihood of misidentification.   Duncan did not know the shooter's name but saw the shooter more than once before the shooting.   McNeal claims that Duncan focused on the firearm.   He did.   But Duncan also testified that he was "real close" to McNeal and had time to notice that McNeal was tangled up in his two shirts while extracting a firearm from his waistband before shooting Duncan in the groin.[110]   Duncan's recognition of McNeal from seeing him in the neighborhood and just before the shooting made his identification in the lineup more reliable than had he no familiarity with

---

[106] ECF No. 117-1.

[107] ECF No. 22-27 at 42.

[108] *Id.* at 43.

[109] *Id.* at 46.

[110] ECF No. 119-12 at 54.

McNeal.  And two officers testified that Duncan provided a description of the shooter matching McNeal, and Duncan's description and familiarity with the shooter was corroborated by the neighbor Hemsley who heard Duncan tell the police that "he knew the guy and that [the shooter] was a[n African American] guy."[111]

McNeal contends that Duncan's identification is unreliable because the incident happened at night, Duncan was under the influence, Duncan focused on the gun, his description was vague, and Duncan was hospitalized and given morphine for several days between the incident and the identification.  Though such factors are relevant to a jury's consideration of the reliability of an identification,[112] they do not support suppression of the identification as an unreliable product of unnecessary and suggestive police procedures.

All fairminded jurists would agree that McNeal has not established a substantial claim that trial counsel's failure to move to suppress the identification fell below an objective standard of reasonableness or a reasonable probability the motion would have been granted had it been made.  I thus dismiss with prejudice ground I(B) as procedurally defaulted, and I deny a certificate of appealability on this ground.

### 3.      *Ground I(C): counsel's failure to exclude references to the anonymous note*

McNeal alleges in ground I(C) that trial counsel was ineffective in failing to move in limine to exclude admission and reference to the anonymous note as hearsay, object to the prosecutor's opening statements that the note identified McNeal as the shooter, and object to the prosecutor's questions to Detective Colon about the note.  He claims that references to the anonymous note led the jury to believe that the note's author identified McNeal as the shooter.

---

[111] ECF No. 22-27 at 88–89; ECF No. 22-28 at 2, 8–9.

[112] *Perry*, 565 U.S. at 239.

1  Respondents contend that counsel objected to questions about the note, and the note was

2  excluded as a result.  They argue that McNeal was not prejudiced because the note was not the

3  sole basis for developing McNeal as a suspect, plus Duncan identified McNeal as the shooter.[113]

4        *a.*     ***The state appellate court's determinations***

5       In state postconviction review proceedings, the Nevada Court of Appeals determined that

6  McNeal failed to demonstrate that trial counsel's performance was ineffective:

> [M]cNeal argues his trial counsel was ineffective for failing to object to references made during opening statements to the contents of an anonymous note and for failing to file a motion in limine to preclude reference to the note's contents.  McNeal asserts the contents of the note constituted hearsay and should not have been discussed at trial.  McNeal fails to demonstrate his trial counsel's performance was deficient or resulting prejudice.  During opening statements, the State informed the jury the police received an anonymous note, and that the note mentioned an individual with the moniker Rock along with a brief description of Rock.  Testimony presented at trial demonstrated McNeal was Rock and the note caused the police to focus their investigation upon McNeal.  During trial, the district court only permitted the State to question a witness regarding the note as it pertained to his investigation and did not offer the note's contents for the truth of the matter asserted.  Under these circumstances, McNeal does not demonstrate his counsel's actions with respect to the discussion of the note during opening statements amounted to objectively unreasonable conduct.  *See Rice v. State,* 113 Nev. 1300, 1312–13, 949 P.2d 262, 270 (1997) (explaining overstatements made by a prosecutor during opening statements will not amount to misconduct unless the statement was made in bad faith), *abrogated on other grounds by Rosas v. State,* 122 Nev. 1258, 1265 n.10 147 P.3d 1101, 1106 n.10 (2006).  Given the limited discussion of the note and the additional evidence of McNeal's guilt presented at trial, McNeal fails to demonstrate a reasonable probability of a different outcome at trial had counsel sought to further limit discussions of the contents of the note.  Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.[114]

---

[113] ECF No. 66 at 15–17; ECF No. 114 at 13–15.

[114] ECF No. 24-11 at 5–6.

**b.     *The state appellate court reasonably determined that trial counsel did not perform deficiently by failing to move to exclude the anonymous note or by failing to object to the prosecutor's opening references to it.***

McNeal claims that the state appellate court's determination was based on an unreasonable determination of the facts because it omitted the prosecutor's opening remarks inaccurately claiming that the note said "Rock was responsible for the shooting—or that they heard Rock was looking to shoot someone."[115]  The state appellate court accounted for the prosecutor's remarks by citing authority holding that it is not misconduct for a prosecutor's arguments to overstate what can be proved at trial, so long as those remarks weren't made in bad faith.  I find that the state appellate court's failure to quote the prosecutor's misstatement does not constitute clear and convincing evidence that the state appellate court's determinations are based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceedings.

I apply deferential review to the state appellate court's determination that trial counsel's performance was not deficient under *Strickland* and find it objectively reasonable.  The record reflects that, at the time of opening statements, defense counsel anticipated that the note would be admitted into evidence and its contents would benefit McNeal's misidentification defense.  In opening remarks, defense counsel stated that the jury would see the anonymous note and see that it did not identify McNeal as the shooter.  As counsel anticipated that the note would be admitted into evidence and was potentially helpful to the defense, it was objectively reasonable for counsel to refrain from moving pretrial to exclude the note and any references to it or from objecting to the prosecutor's opening remarks.

---

[115] ECF No. 116 at 28.

During trial, defense counsel changed course and successfully objected to admission of the contents of the note.  The prosecutor argued that defense counsel initially intended to stipulate to the note's admission and defense counsel acknowledged his change in strategy.[116]  In response to defense counsel's objections, the trial court prohibited the prosecutor from eliciting testimony about the contents of the note, permitting him only to ask questions about the actions the detective took based on the note, i.e., that he developed "a suspect."  Defense counsel's last-minute decision to object to the note did not fall below an objective standard of reasonableness, as it limited testimony about the contents of the note that may have harmed McNeal's defense. So McNeal is not entitled to federal habeas relief for ground I(C).  I will, however, grant a certificate of appealability for ground I(C) because reasonable jurists could find my deferential review and conclusion on the merits of this claim debatable or wrong.[117]

### 4.      Ground I(D): counsel's failure to object to the prosecutor's statements about drug dealing

In ground I(D), McNeal alleges that trial counsel was ineffective in failing to object to the prosecutor's statements that McNeal associated with men involved in drug dealings as "the jury believed that he was a drug dealer."  Respondents argue that the prosecutor never insinuated that McNeal sold drugs.[118]

---

[116] ECF No. 22-27 at 34–35.

[117] *Slack*, 529 U.S. at 484.

[118] ECF No. 66 at 18–20; ECF No. 114 at 15–16; ECF No. 116 at 28–31.

1          **a.       The state appellate court's determination**

2          In state postconviction proceedings, the Nevada Court of Appeals determined that trial

3    counsel was not ineffective in failing to object to the prosecutor's opening and closing statements

4    concerning drug activities:

5                    McNeal argues his trial counsel was ineffective for failing to object
                     when the State implied McNeal was a drug dealer during opening
6                    statements and closing arguments.  McNeal fails to demonstrate his
                     trial counsel's performance was deficient or resulting prejudice. As
7                    discussed on direct appeal, the district court permitted the victim to
                     explain he viewed McNeal with a group who sold drugs, but he
8                    had not seen McNeal personally sell drugs.  *McNeal v. State,*
                     Docket No. 64076 (Order of Affirmance, May 13, 2014).  A
9                    review of the challenged comments during opening statements and
                     closing arguments reveals the State complied with the district
10                   court's ruling.  *See Garner v. State,* 78 Nev. 366, 371, 374 P.2d
                     525, 528 (1962) (stating during opening statements "[i]t is proper
11                   for the prosecutor to outline his theory of the case and to propose
                     those facts he intends to prove"); *see also Truesdell v. State,* 129
12                   Nev. ___, ___, 304 P.3d 396, 402 (2013) (during closing
                     arguments "the prosecutor may . . . assert inferences from the
13                   evidence and argue conclusions on disputed issues").  Accordingly,
                     McNeal fails to demonstrate objectively reasonable counsel would
14                   have objected to the statements or there was a reasonable
                     probability of a different outcome at trial had counsel objected.
15                   Therefore, the district court did not err in denying this claim
                     without conducting an evidentiary hearing.[119]

16

17         **b.       The state appellate court reasonably determined that trial counsel's
                     failure to object to the prosecutor's statements about drug dealing was
18                   not deficient performance.**

19         I find objectively reasonable the state appellate court's determination that trial counsel's

20   performance was not deficient under *Strickland*.  The state-court record shows that the

21   prosecutor's opening statements complied with the trial court's pretrial inclination to allow

22   references to drug dealing.  Given that pretrial ruling, an objectively reasonable defense attorney

23
     _____

     [119] ECF No. 24-11 at 6–7.

                                          29

would not have objected to the state's opening remarks.  The record also shows that the prosecutor's closing remarks substantially complied with the trial court's ruling as the prosecutor did not state that McNeal was selling drugs.  Given Duncan's testimony that he did not see McNeal sell drugs, and defense closing remarks emphasizing that the other four men were selling drugs and Duncan's altercation with those men arose from their refusal to sell Duncan drugs, an objectively reasonable trial attorney would not have objected to the prosecutor's closing remarks.  McNeal is not entitled to federal habeas relief for ground I(D), and I deny a certificate of appealability on that ground.

### 5.     Ground I(E): counsel's failure to investigate witnesses

McNeal alleges that trial counsel failed to investigate witnesses, including those who called 9-1-1 and those who did and did not give statements to police.  He claims prejudice because the only evidence against him was Duncan's allegedly problematic identification and further investigation into other witnesses "could have uncovered crucial eye-witness testimony." This claim is procedurally defaulted,[120] so McNeal must show cause and prejudice to overcome that default.  Respondents contend that McNeal cannot do so because he does not specify what evidence an investigation would have produced or how it would have changed the outcome of the trial.[121]

I find that McNeal's IAC claim against trial counsel for failing to investigate witnesses is insubstantial.  To prevail on an IAC claim for failure to investigate, a petitioner must show "what additional information would be gained by the discovery [he] claims was necessary."[122]

---

[120] *See* ECF No. 83.

[121] ECF Nos. 66 at 20; 114 at 16–17; 116 at 31.

[122] *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001).

McNeal fails to identify any witnesses who possessed information about the shooter.  He fails to specify what evidence an investigation of witnesses would have produced or how such evidence might have changed the outcome of the trial.  McNeal's conclusory allegations, unsupported by a statement of specific facts,[123] fail to establish a substantial—not just conceivable—likelihood of a different result[124] and do not warrant habeas relief for ineffective assistance of counsel. Because McNeal fails to overcome the procedural default, I dismiss ground I(E) with prejudice and deny a certificate of appealability.

**C.    Ground II: the trial court's confrontation-clause error**

McNeal alleges in ground II that the trial court violated his confrontation-clause rights under the Sixth and Fourteenth Amendments by allowing Detective Colon's testimony concerning the anonymous note.  He claims that the testimony introduced a statement by an anonymous witness who was not subject to confrontation and cross-examination, and the prosecutor's opening remarks and the detective's testimony supported an inference, made by the jury, that the note identified McNeal as the shooter.  Respondents contend that there was no confrontation-clause violation because the note was not admitted into evidence; the detective did not testify to the note's contents; and the purpose of the detective's testimony was to explain the progression of the investigation, not to establish the truth of the matter asserted in the note.[125]

**1.    *Confrontation-clause standards***

The Sixth Amendment's confrontation clause guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

---

[123] *See Borg*, 24 F.3d at 26.

[124] *Pinholster*, 563 U.S. at 189 (citing *Richter*, 562 U.S. at 112).

[125] ECF No. 66 at 21–23; ECF No. 114 at 17–18; ECF No. 116 at 32–35.

1  him."[126]  United States Supreme Court precedent "make[s] it clear that the mission of the

2  confrontation clause is to advance a practical concern for the accuracy of the truth-determining

3  process in criminal trials by assuring that the trier of fact [has] a satisfactory basis for evaluating

4  the truth of the prior statement."[127]  In *Crawford v. Washington*, the United States Supreme Court

5  held that the confrontation clause bars "admission of [prior] testimonial statements of a witness

6  who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior

7  opportunity for cross-examination."[128]

8        The High Court has not provided a comprehensive definition of "testimonial statements"

9  but has instructed that, when assessing whether a statement is "testimonial," "the question is

10  whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the

11  conversation was to "creat[e] an out-of-court substitute for trial testimony."[129]  Generally,

12  statements are testimonial if they "were made under circumstances [that] would lead an objective

13  witness reasonably to believe that the statement would be available for use at a later trial"[130] and

14  "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary

15  hearing, before a grand jury, or at a former trial; and to police interrogations."[131]

16        In the context of "statements made to law enforcement personnel during a 911 call or at a

17  crime scene," "[s]tatements are nontestimonial when made in the course of police interrogation

18  under circumstances objectively indicating that the primary purpose of the interrogation is to

19

20  ---

[126] U.S. Const. amend. VI.

21  [127] *Dutton v. Evans*, 400 U.S. 74, 89 (1970) (cleaned up).

[128] *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004).

22  [129] *Ohio v. Clark*, 576 U.S. 237, 245 (2015).

23  [130] *Id.* at 52.

[131] *Id.* at 68.

enable police assistance to meet an ongoing emergency," but they are testimonial "[w]hen the circumstances objectively indicate that there is no such ongoing emergency[] and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."[132]

The Supreme Court has also recognized that statements made in the absence of interrogation are not necessarily nontestimonial: "The Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation.[133]  If the primary purpose of a statement is not testimonial, "the admissibility of that statement is the concern of state and federal rules of evidence, not the confrontation clause."[134]  Thus, the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."[135] For example, officer testimony about anonymous complaints naming the defendant as an individual engaged in the illegal sale of eagle parts, which led them to investigate the defendant, did not violate the confrontation clause after the jury was instructed that the content of the calls must not to be considered for its truth, but only to explain the reason for the officers' conduct.[136]

### 2.   *The state appellate court's determination*

On direct appeal, McNeal claimed that the trial court erred by permitting Detective Colon to testify about the anonymous note for two reasons: (1) it violated the confrontation clause and

---

[132] *Davis v. Washington*, 547 U.S. 813, 817, 822 (2006).

[133] *Id.* at 822 n.1 (cleaned up).

[134] *Clark*, 576 U.S. at 245–46 (cleaned up).

[135] *Crawford*, 541 U.S. at 59 n.9.

[136] *United States v. Wahchumwah*, 710 F.3d 862, 871 (9th Cir. 2013) (quoting *Crawford*, 541 U.S. at 59 n.9).

(2) it abused its discretion by denying his hearsay objection.[137]  McNeal argued that his lawyer's

failure to object based on the confrontation clause did not waive the claim for appeal because he

objected to the testimony at trial on related grounds, citing *Ramirez v. State*.[138]  In *Ramirez*, the

Supreme Court of Nevada decided that a confrontation-clause claim was preserved even though

counsel did not specify that ground for objection at trial, and it entertained the claim on appeal

because counsel objected at a critical juncture and because the Court was willing to address

"constitutional error sua sponte."[139]

The state appellate court determined that the admission of the detective's testimony was

not an abuse of discretion as the anonymous note was not admitted, and the note's content was

neither the subject of the testimony nor offered for the truth of the matter asserted:

> [M]cNeal contends that the district court abused its discretion by
> overruling his hearsay objection to testimony pertaining to an
> anonymous note discovered near the crime scene by investigating
> officers.  We disagree.  A district court's decision to admit or
> exclude evidence is reviewed for an abuse of discretion.  *See*
> *Mclellan v. State,* 124 Nev. 263, 267, 182 P.3d 106, 109 (2008).
> Here, the district court allowed the State to question Detective
> Marc Colon about the anonymous note only to the extent that it
> aided in the development of the investigation; the content of the
> note was not the subject of the State's direct examination, offered
> for the truth of the matter asserted, or admitted as an exhibit for the
> jury's consideration.  We conclude that the district court did not
> abuse its discretion by overruling McNeal's objection to the State's
> line of questioning.[140]

---

[137] ECF No. 23-15 at 15–19.

[138] ECF Nos. 23-15 at 15–18; 23-17 at 5.

[139] *Ramirez v. State*, 958 P.2d 724, 730 (Nev. 1998).

[140] ECF No. 23-18 at 4.

1

2
### 3. The trial court did not violate the confrontation clause by allowing limited testimony about the anonymous note.

3        The state appellate court addressed only the hearsay portion of this issue; it did not

4  expressly address McNeal's confrontation-clause claim.  But there exists a rebuttable

5  presumption that the state court adjudicated the confrontation-clause claim on the merits because

6  the claim was fairly presented[141] and the state court addressed a related claim, but it did not

7  expressly acknowledge this one.[142]  McNeal has not rebutted that presumption, so I consider the

8  confrontation-clause claim adjudicated on its merits, and I review it under AEDPA.

9        If a state court adjudicates a claim on the merits but fails to explain its underlying

10 reasoning, a federal habeas court engages in "an independent review of the record" to determine

11 whether the state court's decision on the claim was "objectively unreasonable."[143]  "This is not

12 de novo review"; rather, the reviewing court must determine "what arguments could have

13 supported the state court's decision and assess whether fairminded jurists could disagree [over]

14 whether those arguments are unreasonable" or inconsistent with a holding in a prior decision of

15 the Supreme Court.[144]  "So long as fairminded jurists could disagree on the correctness of the

16 state court's decision, AEDPA precludes federal habeas relief."[145]

17

18 ---

[141] McNeal's direct appeal fairly raised a confrontation-clause claim.  ECF No. 23-15 at 15–19;

19 ECF No. 23-16 at 14–19; ECF No. 23-17 at 5–6.

[142] *Johnson v. Williams*, 568 U.S. 289, 298–301 (2013).

20
[143] *Kipp v. Davis*, 971 F.3d 939, 948 (9th Cir. 2020) (cleaned up); *see also Richter*, 562 U.S. at

21 98 (holding that, if a state-court habeas merits decision is unexplained, a reviewing court must
determine whether the petitioner can show "there was no reasonable basis for the state court to

22 deny relief.").

[144] *Kipp*, 971 F.3d at 948; *see also Richter*, 562 U.S. at 102; *Yarborough v. Alvarado*, 541 U.S.

23 652, 663–69 (2004).

[145] *Kipp*, 971 F.3d at 948 (cleaned up).

I conclude that the state appellate court could reasonably determine that Detective Colon's testimony did not violate the confrontation clause because it did not convey to the jury an extra-judicial "testimonial statement." The jury did not see the note. It was not admitted into evidence. Detective Colon did not read the note or paraphrase its contents. Although the prosecutor said in opening statements that the police found an "an anonymous note" that said Rock (aka McNeal) "was responsible for the shooting—or that they heard that Rock was looking to shoot someone," the jury was instructed that arguments of counsel are not evidence.[146] When the jury asked for the note and the prosecutor's opening PowerPoint presentation during deliberations, the trial court refused to provide them to the jury and reminded the jury that neither the note nor the presentation were admitted into evidence.

The detective did not testify that the name "Rock" came from the anonymous note. The detective testified that he developed a suspect from the note but that the suspect named "Rock" (McNeal) derived from unspecified "materials" other than Duncan. The detective's testimony did not assert that the anonymous note "verified" Duncan's identification or description of the shooter.

The trial court did not admonish the jury that the detective's testimony about the anonymous note was not offered for the truth of the matter asserted in the note, as would befit a nontestimonial statement under the hearsay exception. But no one requested the instruction. And an instruction was arguably unnecessary because the detective did not testify about any statements contained in the note that would qualify as hearsay.[147] The jury arguably did not infer

---

[146] ECF No. 22-30 at 16 ("Statements, arguments and opinions of counsel are not evidence in the case.").

[147] Counsel did not request a limiting instruction, and a failure to provide one sua sponte is generally not reversible error. *United States v. Palmer*, 691 F.2d 921, 923 (9th Cir. 1982).

that the anonymous note stated Rock was the shooter, as evidenced by the fact that the jury

sought clarification about "<u>how</u> the detectives were led to the name "Rock" as the shooter."[148]

McNeal urges me to consider the Ninth Circuit's opinion in *Ocampo v. Vail*[149] as

persuasive authority that the detective's testimony describing aspects of the note, but not reading

it into evidence, violated the confrontation clause.  In *Ocampo*, two witnesses told police that the

defendant was the shooter, and they offered that testimony at trial.[150]  A third witness did not

testify.[151]  One detective testified that the third witness "verified" the statements of "the other

two" witnesses.[152]  A second detective testified that he showed Ocampo's photograph to

witnesses because a coconspirator's confession and two additional witnesses implicated

Ocampo.  In closing argument, the prosecutor stated that the third witness corroborated the

witnesses who identified Ocampo as the shooter.[153]  The panel concluded that the detectives'

testimony violated the confrontation clause because the jury was likely to infer that the third

witness, who did not testify and was not subject to cross-examination, identified Ocampo as the

shooter.[154]  The panel explained that it "would be an unreasonable application of the core

confrontation-clause principle underlying *Crawford* to allow police officers to testify to the

---

[148] ECF No. 119-2 at 38 (cleaned up).

[149] *Ocampo v. Vail*, 649 F.3d 1098, 1102–05, 1108–13 (9th Cir. 2011).  While only Supreme Court precedent operates as clearly established law for AEDPA purposes and "[c]ircuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced,'"[149] "[c]ircuit precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citation omitted).

[150] *Ocampo*, 649 F.3d at 1101–02.

[151] *Id.* at 1102–05.

[152] *Id.* at 1111.

[153] *Id.* at 1104–05.

[154] *Id.* at 1112.

1  substance of an unavailable witness's testimonial statements as long as they do so descriptively

2  rather than verbatim or in detail."[155]

3          Detective Colon's testimony is materially distinguishable from the testimony in *Ocampo*.

4  Detective Colon did not testify that the anonymous note "verified" Duncan's identification of

5  McNeal as the shooter.  He did not state that McNeal's photograph was included in the lineup

6  based on an identification contained in the anonymous note.  Ultimately, Detective Colon,

7  without disclosing that the anonymous note named Rock as a suspect, testified that Rock became

8  a suspect based on unspecified "materials" at the scene and "other sources" besides Duncan's

9  identification.  As reflected in the jury's fourth question about the note during deliberations, and

10 unlike the officers' testimony in *Ocampo*, Detective Colon's testimony did not lead to an

11 inevitable inference that the anonymous note contained a statement that purported to identify

12 Rock as Duncan's shooter.

13         This case is more similar to *DeJesus v. Perez*,[156] in which the Second Circuit recently

14 held that a state court did not unreasonably apply federal law by concluding there was no

15 confrontation-clause violation when officers testified that they "had a suspect in mind based on

16 their investigation."[157]  The officers did not divulge to the jury that the "investigation" included

17 following up on an anonymous call to the victim's family that identified the petitioner as the

18 shooter by name or that the caller's identification prompted the police to place the petitioner's

19 photograph in a lineup shown to an eyewitness.[158]  The Second Circuit held that, because the

20 officer's testimony did not imply that a non-testifying individual accused the defendant of the

---

[155] *Id.* at 1109.

[156] *DeJesus v. Perez*, 813 F. App'x 631 (2d Cir. 2020) (summary order).

[157] *Id.* at 632.

[158] *Id.* at 635.

murder, the state court reasonably concluded there was no confrontation-clause violation.[159]
Here, the state attempted to employ a similar technique to the police in *Perez*, albeit only after
Detective Colon disclosed that the anonymous note led him to develop a suspect.  However, the
state was able to distance Detective Colon's testimony from the note and did not elicit any
testimony that the note identified the shooter.

I find that the state appellate court could reasonably conclude that the detective's
testimony did not provide the jury with "testimonial statements" subject to the confrontation
clause.  I also find it possible that fairminded jurists could disagree whether the note and
testimony about it violated the confrontation clause.  Thus, I deny habeas relief for ground II but
grant a certificate of appealability because reasonable jurists could find my determinations
debatable or wrong.[160]

**D.      Ground IV: prosecutorial misconduct**

In ground IV, McNeal claims that he was denied his right to a fair trial because the
prosecutor engaged in misconduct during opening and closing statements in violation of the
Fifth, Sixth, and Fourteenth Amendments by (A) suggesting McNeal is a drug dealer without
evidence or support and (B) mischaracterizing the anonymous note as identifying McNeal as the
shooter during opening statements.  Respondents respond that McNeal didn't exhaust these
claims and they nevertheless fail on the merits.  McNeal counters that the respondents waived an
exhaustion defense by failing to include it in their motion to dismiss the petition.[161]  I bypass the
exhaustion issue and proceed to deny relief on the merits.

---

[159] *Id.*

[160] *Slack*, 529 U.S. at 484.

[161] ECF No. 66 at 26–29; ECF No. 114 at 19–22; ECF No. 116 at 36–37.

"An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."[162]  A federal court may deny an unexhausted claim on the merits if "it is perfectly clear that the applicant does not raise even a colorable federal claim."[163]  A challenge that is not "wholly insubstantial, immaterial, or frivolous" raises a colorable constitutional claim.[164]

To warrant habeas relief, acts of prosecutorial misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."[165]  To determine whether a prosecutor's comments rise to the level of a due-process violation, courts consider the comments "in the context in which they are made" and examine "the entire proceedings."[166] Factors to consider when determining whether a prosecutor's comment rendered a trial constitutionally unfair include: (1) whether the comment misstated or manipulated the evidence; (2) whether the judge admonished the jury to disregard the comment; (3) whether defense counsel invited the comment; (4) whether defense counsel had an adequate opportunity to rebut the comment; (5) the prominence of the comment in the context of the entire trial; and (6) the

---

[162] 28 U.S.C. § 2254(b)(2) (cleaned up).

[163] *Granberry v. Greer*, 481 U.S. 129, 135 (1987); *see also Cassett v. Stewart*, 406 F.3d at 614, 624 (9th Cir. 2005) (adopting the holding in *Granberry*).

[164] *Udd v. Massanari*, 245 F.3d 1096, 1099 (9th Cir. 2001), *as amended on denial of reh'g* (May 3, 2001) (citing *Boettcher v. Sec'y of Health & Human Serv.*, 759 F.2d 719, 722 (9th Cir. 1985)).

[165] *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)).

[166] *See Boyde v. California*, 494 U.S. 370, 385 (1990); *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995).

weight of the evidence.[167]  The touchstone of due-process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.[168]

In Nevada, the prosecution has a duty to refrain from making statements in opening arguments that cannot be proved at trial.[169]  "It is proper for the prosecutor to outline his theory of the case and to propose those facts he intends to prove."[170]  Even if the prosecutor overstates in his opening statement what he is later able to prove at trial, it's only misconduct if the prosecutor makes these statements in bad faith.[171]

### 1.   *McNeal fails to state a colorable claim that the prosecutor's remarks concerning drug dealing denied him a fair trial.*

McNeal contends that the following opening remarks of the prosecutor denied him a fair trial because they suggested that McNeal was a drug dealer:

> A week prior to March 15, 2013, Mr. Duncan has a conversation— a conflict with a group of individuals.  And that group of individuals, again, all Hispanic, except for one individual, that's Mr. McNeal, the Defendant, and tells them to basically move on; get away from this area.  This—you don't have to—you know, if—I don't care how you make your living, but just move away from my apartment.  Move away from where I'm living.  Move away from the families here.
> . . . .
> Now on March 15, 2013, . . . About 9:30 he runs into a group of people he saw a week before; the group of Hispanic males and Mr. McNeal, the Defendant. And Mr. Duncan says, move on.  Don't be doing this stuff—don't be selling this stuff in front of my house; move on.[172]

---

[167] *Hein v. Sullivan*, 601 F.3d 897, 912–13 (9th Cir. 2010) (citing *Darden*, 477 U.S. at 182).

[168] *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

[169] *Riley v. State*, 808 P.2d 551, 555 (Nev. 1991).

[170] *Garner v. State*, 374 P.2d 525, 528 (Nev. 1962).

[171] *Johnson v. State*, 148 P.3d 767, 776 (Nev. 2006) (quoting *Rice v. State*, 949 P.2d 262, 270 (Nev. 1997), *modified on other grounds by Richmond v. State*, 59 P.3d 1249, 1254 (Nev. 2002)).

[172] ECF No. 119-12 at 22–23; ECF No. 66 at 26–27.

McNeal claims that the prosecutor likewise denied him a fair trial in these closing remarks:

> [Duncan] indicated that he ran into a group of individuals that he
> had seen there previously.  He indicated there were four Hispanic
> males, one African[-]American male.  Now he didn't know these
> individuals, but he did recognize their faces.  He recognized them
> as being associated with some sort of negative dealings in that area
> that he was concerned with.[173]

I find that this claim is wholly insubstantial, frivolous, and lacks factual support.  The court's pretrial ruling indicating that testimony about potential drug dealing would be permitted made the prosecutor's opening remarks appropriate.  The remarks didn't exceed any court limitations or directly state that McNeal was selling drugs.  And even if the prosecutor implied that McNeal participated in the drug transactions of the other men, Duncan's testimony contradicted that argument, and the jury was instructed that counsel's argument is not evidence.  Plus, as the trial court pointed out, the defense was free to emphasize Duncan's testimony.  McNeal does not establish a colorable claim that the prosecutor committed misconduct or that the prosecutor's remarks about drug dealing so infected the trial with unfairness as to make the resulting convictions a denial of due process.  Ground IV(A) is dismissed with prejudice, and I deny a certificate of appealability.

### 2.   *McNeal fails to establish a colorable claim that the prosecutor's remarks concerning the anonymous note denied him a fair trial.*

McNeal alleges that the prosecutor committed misconduct in opening remarks by leading the jury to believe that the anonymous note stated that McNeal shot Duncan.[174]  I find that McNeal fails to state a colorable claim for prosecutorial misconduct.  The parties anticipated that

---

[173] ECF No. 22-28 at 33–34; ECF No. 66 at 27.

[174] ECF No. 66 at 26–29; ECF No. 119-12 at 26.

the anonymous note would be introduced into evidence when the prosecutor referenced it in opening statements, meaning he had every reason to suspect that the jury would see the note and come to its own conclusions about what the evidence showed.[175]  Indeed, defense counsel doubled down on that notion in his opening statement, explaining that the jury would see the note and learn that it didn't actually identify McNeal as the shooter.[176]  While the prosecutor's comment that the note said "Rock was responsible for shooting—or that they heard that Rock was looking to shoot someone"[177] was an overstatement, defense counsel had the opportunity to rebut the remark and McNeal has not shown and cannot show that the prosecutor made that statement in bad faith.  So I find no merit to the argument that the prosecutor's opening remarks rendered McNeal's trial constitutionally unfair.

McNeal's complaints about the prosecutor's closing remarks fare no better.  The prosecutor never mentioned the anonymous note in his closing arguments; he only reiterated that Detective Colon found out that the suspect goes by the name Rock and Rock matched Duncan's description of the shooter as a rebuttal to defense counsel's argument that Duncan's identification was the only evidence pointing to McNeal as the shooter.  The prosecutor's remarks were consistent with evidence concerning the note and were limited to the note's purpose of directing Metro's investigation to McNeal, and nothing more.  McNeal fails to establish that the prosecutor's remarks were misconduct or so infected the trial with unfairness as to make the resulting conviction a denial of due process.  So I dismiss ground IV(B), but I issue a

---

[175] ECF No. 22-27 at 34–35.

[176] ECF No. 22-23 at 28, 33.

[177] *Id.* at 26–27.

1  certificate of appealability because reasonable jurists could debate whether this ruling is

2  correct.[178]

3  **E.    Ground V: defense counsel's conflict of interest**

4          In ground V, McNeal alleges that he was denied effective assistance of counsel due to an

5  irreconcilable conflict because counsel disagreed with McNeal's decision to testify at the

6  preliminary hearing and failed to communicate with McNeal, file motions on his behalf,

7  investigate his case, or review discovery with him.  Respondents argue that McNeal cannot

8  overcome the procedural default of this claim because it is really a claim of trial-court error—not

9  ineffective assistance of counsel—and the claim should be denied on the merits.[179]  I previously

10  construed ground V as an IAC claim, and McNeal argues in reply that it is an IAC claim, not a

11  claim of court error.[180]  Respondents have not made a convincing showing that I and McNeal

12  both misinterpreted this claim, so I proceed to address ground V as an IAC claim and consider

13  whether McNeal has overcome its procedural default.

14          *1.    Conflict-of-interest standards*

15          "The Sixth Amendment right to counsel includes the 'correlative right to representation

16  that is free from conflicts of interest.'"[181]   "[A]n actual conflict of interest" means "a conflict

17  *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties."[182]

18  Although the Sixth Amendment does not guarantee a "meaningful relationship" between a client

19

---

20  [178] *Slack*, 529 U.S. at 484; *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).

    [179] ECF No. 66 at 29–32; ECF No. 114 at 22–24.

21  [180] ECF No. 116 at 36.

22  [181] *Campbell v. Rice*, 408 F.3d 1166, 1170 (9th Cir. 2005) (quoting *Wood v. Georgia*, 450 U.S. 261, 271 (1981)).

23  [182] *Mickens v. Taylor*, 535 U.S. 162, 171 (2002) (quoting *Cuyler*, 446 U.S. at 349–50) (footnote omitted).

44

1  and his attorney,[183] an irreconcilable conflict between a defendant and counsel can result in the

2  constructive denial of the Sixth Amendment right to counsel.[184]

3      An irreconcilable conflict occurs only if there is conflict "so great that it resulted in a

4  total lack of communication or other significant impediment that resulted in turn in an attorney-

5  client relationship that fell short of that required by the Sixth Amendment."[185]  To determine

6  whether an irreconcilable conflict exists, courts in Nevada look to three factors: (1) the extent of

7  the conflict; (2) the adequacy of the inquiry by the trial court; and (3) the timeliness of the

8  motion for substitution of counsel.[186]  Conflicts of the defendant's "own making" or arising

9  "over decisions that are committed to the judgment of the attorney and not the client . . ." are not

10 irreconcilable conflicts that constitute a denial of counsel.[187]

11     "A defendant need not show prejudice when the breakdown of a relationship between

12 attorney and client from irreconcilable differences results in the complete denial of counsel."  If

13 no actual or irreconcilable conflict is proved, and only a possibility of conflict is shown, a

14 petitioner must meet the performance and prejudice standards of *Strickland*.[188]

15     **2.    *McNeal's relationship with his trial counsel***

16     McNeal and his trial counsel disagreed about McNeal's desire to testify at the

17 preliminary hearing to explain his innocence and his version of the events surrounding the

18 shooting.  Counsel, on the record, advised McNeal against testifying.  The state justice court

19

20 [183] *Morris v. Slappy*, 461 U.S. 1, 14 (1983).

   [184] *See Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970).

21 [185] *Schell v. Witek*, 218 F.3d 1017, 1026 (9th Cir. 2000).

22 [186] *United States v. Moore*, 159 F.3d 1154 (9th Cir. 1998); *see also Young v. State*, 102 P.3d 572,
   574–76 (Nev. 2004) (adopting *Moore*'s three-part test).

23 [187] *Schell*, 218 F.3d at 1026.

   [188]*Moore*, 159 F.3d at 1157–58.

canvassed and advised McNeal about his right not to testify.  McNeal testified anyway.  At the conclusion of the preliminary hearing, defense counsel confirmed that he provided McNeal with "a full and complete copy of the discovery with all witness and victim contact information redacted, literally every piece of paper that I have on this case at this point."[189]

McNeal appeared in the state district court a week later and invoked the 60-day rule, so trial was scheduled for June 10, 2013.[190]  At a calendar call a few days before trial,[191] the court learned that McNeal wanted a different appointed attorney because his counsel did not share his views about the defense theory for trial, but the court denied the motion because it was untimely and because a dislike of current counsel is not a legitimate basis to appoint new counsel.[192]

McNeal's preliminary-hearing testimony was presented to the jury.  Defense counsel argued, in accordance with McNeal's explanation of the events in that testimony, that McNeal was present at the shooting but did not shoot Duncan, Duncan invoked Hell's Angels to threaten the Hispanic men, Duncan had misidentified McNeal, and his identification was racially motivated because Duncan was associated with Hell's Angels and the Aryan Brotherhood.[193]

Following the announcement of the jury's verdict, but while the jury deliberated over whether McNeal was in possession of a firearm as an ex-felon, McNeal informed the trial court that his counsel "just ignored . . . my plain . . . whole defense to defending myself in this case." The court listened to McNeal's concerns about the evidence and his desire for new counsel. McNeal said that he was innocent, and he disputed the evidence and truthfulness of testimony

---

[189] ECF No. 22-4 at 8–13.

[190] ECF No. 119-2 at 2.

[191] ECF No. 117-2 at 3.

[192] *Id.* at 2–5.

[193] *See* ECF No. 22-28 at 42–70.

1 elicited at trial.  The trial court told McNeal that he must wait until after sentencing to address

2 those issues on appeal and stated that it would later appoint counsel for the appeal to address

3 McNeal's concerns about innocence and the evidence at trial.[194]

4        After the verdict, McNeal filed a pro se motion to dismiss counsel and appoint new

5 counsel, claiming that trial counsel did not communicate at any length about the case; investigate

6 McNeal's claims of innocence; or file motions that he believed were warranted, including a

7 motion for exculpatory materials due to lack of a full case report.  McNeal claimed that he

8 requested "tapes" and "missing documents" that he believed were relevant to his defense, but

9 trial counsel said that there weren't any, the state failed to turn them over, or they were

10 irrelevant.  McNeal claimed that counsel didn't listen to his views about the case, eroding

11 McNeal's "faith and trust" in his attorney.[195]

12        The minutes of the hearing on the motion to dismiss counsel reflect that McNeal claimed

13 that he and counsel were not communicating with each other.  Defense counsel responded that he

14 planned to meet with McNeal upon receipt of the presentence-investigation report.  The state

15 district court denied the motion, ruling that defense counsel was aware of McNeal's request for

16 an appeal and was under a duty to perfect that appeal.  The court reiterated that McNeal could

17 request new counsel on appeal at the Supreme Court level.[196] Later, at sentencing, trial counsel

18

19

20

21

---

22 [194] ECF No. 22-28 at 63–64, 89–91.

[195] ECF No. 23 at 3–5.

23 [196] *See* ECF No. 119-2 at 22–12.  McNeal did not file the transcript of the proceedings for the hearing on the motion to dismiss counsel, which was held on July 18, 2013.

1  indicated that he would "be on for the appeal."[197]  McNeal did not ask the appellate court to

2  appoint new counsel.[198]

3

4  ### 3.   *McNeal fails to overcome the procedural default of his trial-counsel-ineffectiveness claim based on an alleged conflict of interest.*

5       I find that McNeal fails to establish a substantial claim that trial counsel was ineffective

6  either due to an actual or irreconcilable conflict, or that the possibility of a conflict caused

7  McNeal to receive ineffective assistance of counsel under *Strickland*.  McNeal erroneously relies

8  on a broader standard for a conflict of interest, which he ascribes to *United States v. Baker*,

9  stating that "[a]n attorney has an actual conflict of interest when during the course of the

10  representation, the attorney's and the defendant's interests diverge with respect to a material

11  factual or legal issue or to a course of action."[199]  That partial quote, removed from its context,

12  originated in Justice Marshall's opinion concurring in part and dissenting in part in *Cuyler v.*

13  *Sullivan,* addressing the meaning of "conflict of interest" when counsel represents the conflicting

14  interests of clients, not when a defendant and his lawyer disagree about strategy.[200]

15       McNeal fails to establish any factual basis to support a claim that he had an actual or

16  irreconcilable conflict of interest with counsel.  McNeal stated that his conflict with counsel

17  concerned their differing opinions about the theory of the defense.  The record shows that

18  McNeal's view of his defense prevailed at the preliminary hearing after he testified against

19  counsel's advice.  McNeal's theory of the defense also prevailed at trial, during which defense

20

---

21  [197] ECF No. 67-2 at 11.

    [198] ECF Nos. 23-6; 23-7 at 4; 119-2 at 16.  I take judicial notice of the online docket records of
22  the Supreme Court of Nevada in Case No. 64076.  The docket records may be accessed by the
    public online at 64076: Case View (nvsupremecourt.us).

23  [199] ECF No. 116 at 45 (citing *United States v. Baker*, 256 F.3d 855, 860 (9th Cir. 2001)).

    [200] *Cuyler v. Sullivan*, 466 U.S. at 356 n.3.

1 counsel argued the theory that supported McNeal's testimony.  Any conflict was thus reconciled

2 and did not result in a denial of counsel.

3        I find conclusory McNeal's claims that an irreconcilable conflict, or the possibility of

4 one, caused counsel to provide ineffective assistance under *Strickland*.  McNeal's petition

5 doesn't identify any motions that should have been filed at McNeal's urging or how such

6 motions would have changed the outcome.  He previously claimed that counsel failed to move

7 for discovery of materials under *Brady v. Maryland*.[201]  But he now concedes that his *Brady*

8 claims are without merit.[202]  After the preliminary hearing, counsel gave McNeal all of the

9 discovery he had.  McNeal does not specify what he did not understand about the discovery and

10 how counsel providing a particular explanation of the discovery would have changed the

11 outcome of the proceedings.  McNeal's explanations for his request for different counsel indicate

12 that he and counsel communicated with each other but their opinions about the defense theory

13 and strategy of this case diverged.  McNeal fails to specify how counsel failed to communicate

14 or how additional communication would have changed the outcome of the proceedings.

15        McNeal has not overcome the procedural default for this claim as reasonable jurists

16 would agree that McNeal fails to establish the existence of an actual or irreconcilable conflict of

17 interest or that a conflict resulted in trial counsel ineffectiveness under *Strickland*.  So I dismiss

18 ground V with prejudice as procedurally defaulted.

19 **F.      Ground VII: cumulative error**

20        McNeal contends in ground VII that the cumulative effects of trial errors violated his

21 Fifth, Sixth, and Fourteenth Amendment rights to due process and a fair trial.  Cumulative error

22

23 [201] *Brady v. Maryland*, 373 U.S. 83 (1963).

[202] ECF No. 116 at 49–50.

1  may supply a basis for habeas relief if, "although no single trial error examined in insolation is

2  sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still

3  prejudice a defendant."[203]  Having found no errors, there is nothing for me to cumulate.

4         McNeal also urges me to consider his IAC claims as a whole.  The Ninth Circuit has held

5  that, "[w]hile an individual claiming [IAC] 'must identify the acts or omissions of counsel that

6  are alleged not to have been the result of reasonable professional judgment,'" courts must

7  "consider[] counsel's conduct as a whole to determine whether it was constitutionally

8  adequate."[204]  I divided McNeal's IAC claims based on his grounds for relief and because some

9  of the grounds required an analysis of the facts at different procedural postures.  Assuming that

10 McNeal could overcome the procedural defaults plaguing some of his claims and I could

11 consider the merits of his IAC claims as a whole, I conclude that McNeal has not shown that he

12 was denied a fair trial by the general performance of his trial counsel.  But I grant a certificate of

13 appealability for ground VII as reasonable jurists could debate whether my procedural rulings are

14 correct.[205]

15 **G.  Certificate of appealability**

16        The right to appeal from the district court's denial of a federal habeas petition requires a

17 certificate of appealability.  To obtain that certificate, the petitioner must make a "substantial

18 showing of the denial of a constitutional right."[206] "[If] a district court has rejected the

19 constitutional claims on the merits," that showing "is straightforward: The petitioner must

20 demonstrate that reasonable jurists would find the district court's assessment of the constitutional

21

22 [203] *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996).

   [204] *Browning v. Baker*, 875 F.3d 444, 471 (9th Cir. 2017).

23 [205] *Slack*, 529 U.S. at 484.

   [206] 28 U.S.C. § 2253(c).

claims debatable or wrong."[207]  As stated, I grant a certificate of appealability for McNeal's habeas claims alleged in grounds I(A), I(C), II, and VII.  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.[208]  I decline to issue a certificate of appealability for my resolution of any procedural issues except for the procedural ruling on ground IV(B).

### Conclusion

IT IS THEREFORE ORDERED that McNeal's fifth amended petition for writ of habeas corpus **[ECF No. 66] is DENIED**.  I deny grounds I(A), I(C), I(D), II, VI, and VII, and dismiss with prejudice grounds I(B), I(E), IV, and V of the petition.  **I GRANT a certificate of appealability for grounds I(A), I(C), II, IV(B), and VII**.

The **Clerk of Court is directed to:**

- **SUBSTITUTE** Ronald Oliver for respondent Brian Williams, and

- **ENTER JUDGMENT** accordingly and **CLOSE THIS CASE.**

_____
U.S. District Judge Jennifer A. Dorsey
January 3, 2024

---

[207] *Slack*, 529 U.S. at 484; *see also Giles*, 221 F.3d at 1077–79.

[208] *Id.*